# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| NECA-IBEW PENSION TRUST PLAN,<br>Derivatively on Behalf of Nominal Defendant,<br>SPRINT NEXTEL CORPORATION,<br>   2120 Hubbard Avenue<br>   Decatur, IL 62526<br>                Plaintiff,<br>vs.<br><br>DANIEL R. HESSE, ROBERT R. BENNETT,<br>GORDON M. BETHUNE, LARRY C.<br>GLASSCOCK, JAMES H. HANCE, JR., V.<br>JANET HILL, FRANK IANNA, SVEN-<br>CHRISTER NILSSON, WILLIAM R. NUTI,<br>and RODNEY O'NEAL,<br>Serve At:<br>   Sprint Headquarters<br>   6200 Sprint Parkway<br>   Overland Park, KS 66251<br><br>             Defendants,<br>and<br><br>SPRINT NEXTEL CORPORATION,<br>Serve At:<br>   Sprint Headquarters<br>   6200 Sprint Parkway<br>   Overland Park, KS 66251<br><br>        Nominal Defendant. | CASE NO. 12-cv-2336 JTM/JPO<br><br><br><br><br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff NECA-IBEW Pension Trust Plan ("Plaintiff"), by and through its undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against Defendants named herein.

## I.   NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of Nominal Defendant Sprint Nextel Corp. ("Sprint" or the "Company"), against certain members of Sprint's Board of Directors (the "Board" or "Defendants") seeking to remedy Defendants' breaches of fiduciary duties owed to the Company during a period from 2005, at the latest, through present (the "Relevant Period").

2.      Sprint is a telecommunications company that offers a range of communications services.  The Company offers wireless and wireline voice and data transmission services to subscribers in all 50 states, Puerto Rico, and the U.S. Virgin Islands under the Sprint corporate brand, which includes its retail brands of Sprint®, Boost Mobile®, Virgin Mobile®, and Assurance Wireless®.  Sprint is the third largest wireless communications company in the United States based on wireless revenue, one of the largest providers of wireline long distance services, and one of the largest carriers of Internet traffic in the nation.  The Company is based in Overland, Kansas and is also incorporated in Kansas.  Sprint's common stock trades on the New York Stock Exchange under the symbol "S" and the Company has a current market capitalization of over $7.9 billion.

3.      On April 19, 2012, the Attorney General of New York, Eric T. Schneiderman (the "AG"), issued a press release announcing the filing of a tax fraud lawsuit against Sprint for over $300 million (the "New York Complaint").  The AG was acting on whistleblower information and uncovered a 7-year failure by Sprint to collect and pay sales taxes.  Specifically, the AG said

that Sprint *deliberately* under-collects and underpays millions of dollars in New York state and

local taxes on flat-rate access charges for wireless calling plans.  The AG's lawsuit, which was

brought under the New York False Claims Act, requires the Company to pay three times its

underpayment of over $100 million, plus penalties if found liable.  The AG noted that all of

Sprint's major wireless competitors, including Verizon, AT&T, T-Moblie, and MetroPCS, have

followed the law regarding these taxes.

    4.    The AG's press release regarding the lawsuit portrayed Sprint's actions as a

strategic tax-avoidance scheme that was knowingly and intentionally implemented by the

Company and is still on-going.  The press release stated as follow:

> Since 2002, New York Tax Law has required mobile phone companies to collect
> and pay sales taxes on the full amount of their monthly access charges for their
> calling plans. For example, when a customer pays Sprint a fixed monthly charge
> of $39.99 for 450 minutes of mobile calling time, the law requires Sprint to
> collect and pay sales taxes on the entire $39.99. According to the Attorney
> General's complaint, starting in 2005, Sprint illegally failed to collect and pay
> New York sales taxes on an arbitrarily set portion of its revenue from these fixed
> monthly access charges. *To carry out this plan, Sprint repeatedly and knowingly
> submitted false records and statements to New York State tax authorities. Sprint
> concealed this practice from taxing authorities, its competitors, and its
> customers. [emphasis added]*

> Sprint's scheme is ongoing. Sprint did not correct its sales tax practices when it
> was informed of its illegality, and it has not corrected them even today. As a
> result of Sprint's unlawful actions, its underpayment of New York sales taxes is
> growing by about a $210,000 every week, over $30,000 a day.

> The decision not to collect and pay these taxes arose out of a nationwide effort by
> Sprint to obtain an advantage over its competitors -- not by cutting its prices or
> offering better service -- but by failing to collect and pay sales taxes its
> competitors properly collected and paid. Right before deciding to underpay its
> taxes, Sprint concluded that this practice would position its calling plans as
> cheaper than competitors' plans by $4.6 million per month, collectively, because
> of sales taxes not collected and paid.

    5.    Defendants concealed their wrongdoings for a single reason, to gain a competitive

advantage over Sprint's competitors.  Instead of cutting prices or offering better services, Sprint

decided to under-collect and underpay sales taxes which its competitors properly collected and paid.

6.     Since the disclosure of the illegal conduct, the Board has failed to correct its wrongdoings and continues to this day to under-collect and underpay millions of dollars in taxes on flat-rate access charges for wireless calling plans despite that they know that the conduct is illegal.

7.     As a result, Sprint is liable for the under-collected and underpaid taxes of more than $100 million. Additionally, Sprint may potentially be liable for up to three times this amount (or more than $300 million), plus annual interest of 14.5%, and a penalty of double the amount of fraudulent underpayments or up to 30% of other underpayments.

8.     The understatement of tax liability will impact the Company's stated revenue and earnings per share figures, which could necessitate a restatement of the Company's financial statements.  As a direct consequence, Sprint's stock value will be impacted and the Company would certainly be under close scrutiny by investors and regulators.

9.     Sprint's Board of Directors and certain executive officers have breached their fiduciary duties of good faith and fair dealing owed to the Company and its shareholders. Despite apparent direct and actual knowledge of the tax avoidance scheme, the Company's Board and management continue to evade the taxes owed to New York and are ignoring this costly and illegal course of conduct.  As a result, Sprint is now exposed to and potentially liable to hundreds of millions of dollars.

10.     Plaintiff brings this action on behalf of the Company to, among other things, recover damages caused by the Individual Defendants' unlawful courses of conduct and breaches of fiduciary duty.

## II.   JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), as Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.    This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations and executive offices in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.    Venue is proper in this county pursuant to 28 U.S.C. §1391(a) because Defendants conducted activity in this District that gave rise to Sprint's causes of action and/or because Sprint's causes of action arose in this District.  Venue is also proper in this Court because Sprint has its principal place of business in this District, Plaintiff's claims arose in this District, and Sprint has suffered and will continue to suffer harm in this District.  Venue is also proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of Defendants either resides in or maintains executive offices in this district, Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district, and Sprint is headquartered in this district.

III.   **PARTIES**

   A.   **Plaintiff**

   14.   Plaintiff NECA-IBEW Pension Trust Plan is, and at all relevant times was, a shareholder of Nominal Defendant Sprint.  Plaintiff is a citizen of the State of Illinois and maintains its executive office at 2120 Hubbard Avenue, Decatur, Illinois 62526.

   B.   **Nominal Defendant**

   15.   Nominal Defendant Sprint Nextel Corp. is a Kansas Corporation with its executive offices located at 6200 Sprint Parkway, Overland Park, Kansas 66251. The Company's common stock trades on the New York Stock Exchange under the ticker symbol "S".  The Company served more than 56 million customers at the end of the first quarter of 2012, including approximately 1.82 million wireless customers in New York State.  Sprint has annual revenues of approximately $33 billion per year.

   C.   **The Individual Defendants**

   16.   Defendant Daniel Hesse ("Hesse") was appointed as the Company's Chief Executive Officer, President and a member of the Board of Directors on or about December 17, 2007.  Prior to his employment with Sprint, Hesse was Chairman, President, and Chief Executive Officer of Embarq Corporation. He served as Chief Executive Officer of Sprint's Local Telecommunications Division from June 2005 until the Embarq spinoff in May 2006.  Upon information and belief, Defendant Hesse is a citizen of the State of Missouri.

   17.   Defendant James H. Hance, Jr. ("Hance") is the Company's Chairman of the Board and has served as a Director of the Company since February 2005.  Hance is a member of the Company's Audit Committee and has been designated as an Audit Committee Financial Expert.  Upon information and belief, Defendant Hance is a citizen of the State of Florida.

5

18.     Defendant Robert R. Bennett ("Bennett") has served as a Director of the Company since October 2006.  He is also a member of the Company's Audit Committee and has been designated as an Audit Committee Financial Expert.  In addition, Bennett serves as the Chairman of the Company's Finance Committee and is a member of the Executive Committee. Upon information and belief, Defendant Bennett is a citizen of the State of Colorado.

19.     Defendant Gordon M. Bethune ("Bethune") has served as a Director of the Company since March 2004.  He is also a member of the Company's Nominating & Corporate Governance Committee and the Executive Committee.  In addition, Bethune serves as Chairman of Sprint's Compensation Committee.  Upon information and belief, Defendant Bethune is a citizen of the State of Texas.

20.     Defendant Larry C. Glasscock ("Glasscock") has served as a Director of the Company since August 2007.  Glasscock is also Chairman of the Company's Audit Committee and has been designated as an Audit Committee Financial Expert.  He is also a member of Sprint's Finance Committee and the Executive Committee.  Upon information and belief, Defendant Glasscock is a citizen of the State of Indiana.

21.     Defendant V. Janet Hill ("Hill") has been a member of the Company's Board since 2005.  Hill is also the Chairwoman of the Company's Nominating & Corporate Governance Committee and is a member of the Executive Committee and the Compensation Committee.  Hill served as a director of Nextel Communications, Inc. from November 1999 until its merger with Sprint Corporation in August 2005.  Upon information and belief, Defendant Hill is a citizen of the State of Virginia.

22.     Defendant Frank Ianna ("Ianna") has served as a Director of the Company since March 2009 and is a member of the Audit Committee and the Nominating & Corporate

Governance Committee.  Upon information and belief, Defendant Ianna is a citizen of the State of New Jersey.

23.     Defendant Sven-Christer Nilsson ("Nilsson") has served as a member of the Company's Board since November 2008 and is a member of the Nominating & Corporate Governance Committee.  Upon information and belief, Defendant Nilsson is a citizen of the State of Connecticut.

24.     Defendant William R. Nuti ("Nuti") has been a member of the Company's Board since June 2008 and is a member of the Finance Committee and Compensation Committee. Upon information and belief, Defendant Nuti is a citizen of the State of New York.

25.     Defendant Rodney O'Neal ("O'Neil") has served as a member of the Company's Board since August 2007 and is a member of the Nominating & Corporate Governance Committee as well as the Compensation Committee.  Upon information and belief, Defendant O'Neil is a citizen of the State of Michigan.

26.     Defendants Hesse, Hance, Bennett, Bethune, Glasscock, Hill, Ianna, Nilsson, Nuti and O'Neil are sometimes collectively referred to herein as the "Director Defendants" or "Individual Defendants."

27.     Defendants Hance, Bennett, Glasscock and Ianna, are sometimes collectively referred to herein as the "Audit Committee Defendants."

## IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers and/or directors of Sprint and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Sprint and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company

in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Sprint and its shareholders.  Each director and officer of the Company owes to Sprint and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sprint, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Due to their positions with Sprint, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

30.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Sprint were required to, among other things:

a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.     Exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

d.      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

31.      According to the Audit Committee charter:

*The primary purpose of the Audit Committee are to assist the Board in fulfilling its oversight responsibilities* with respect to: *[emphasis added]*

      a.      the integrity of Sprint Nextel Corporation's ("Sprint Nextel") financial statements and related disclosures as well as related accounting and financial reporting processes,
      b.      Sprint Nextel's compliance with legal and regulatory requirements,
      c.      the independent registered public accounting firm's qualifications, independence, audit and review scope, and performance,
      d.      the audit scope and performance of the internal audit function,
      e.      Sprint Nextel's Ethics and Compliance Program, and
      f.      Enterprise Risk Management Program.

The Audit Committee is to act on behalf of the Board and to oversee all material aspects of Sprint Nextel's accounting and financial reporting processes and the quality and integrity of Sprint's financial statements and related disclosures, including oversight of the activities of Sprint's management and of the independent registered public accounting firm.

32.      The Charter further provides that, "The Audit Committee will have full access to Sprint Nextel's records, officers, employees and outside advisors as necessary to perform its duties. The Audit Committee also has the authority to engage, at Sprint Nextel's expense, the services of independent counselor other independent advisors as it determines necessary to perform its duties."

33.      The Company's Corporate Governance Guidelines, which went into effect in November 2011, stated the following in regards to Board Responsibilities:

A director's principal responsibility is to promote the best interests of Sprint Nextel and its shareholders in overseeing the management of Sprint Nextel's business and affairs. The performance of  these responsibilities entails the following: (1) overseeing the conduct of Sprint Nextel's business generally; (2) reviewing and approving Sprint Nextel's fundamental operating, financial and

other corporate plans, strategies and objectives; (3) selecting, regularly evaluating, fixing the compensation of and, as appropriate, retaining or replacing the Chief Executive Officer (including any other positions held by such individual, the "CEO"); (4) ensuring appropriate attention is devoted to principal senior officer succession plans; (5) approving policies of corporate conduct, including policies regarding (a) compliance with applicable laws and regulations, and (b) maintenance of accounting, financial and other  controls; (6) assessing Sprint Nextel's material risks and business resiliency; (7) ensuring processes are in place to maintain the ethics, integrity and good corporate citizenship of Sprint Nextel; and (8) performing other responsibilities specifically prescribed by applicable laws and regulations and Sprint Nextel's Bylaws or Articles of Incorporation.

A director is expected (1) to prepare for and regularly attend Board and applicable committee meetings; and (2) to devote the time necessary to discharge effectively his or her responsibilities, including keeping informed about Sprint Nextel's performance and competitive position in the marketplace.

Each director has an obligation to keep confidential and not disclose to any person all non-public information that relates to Sprint Nextel's business and not use such information for his or her own personal benefit or the benefit of persons or entities outside of Sprint Nextel, except where the disclosure of such information is authorized by the Board or required by law. Confidential information includes, but is not limited to, information regarding the strategy, business, finances and operations of Sprint Nextel (or any of Sprint Nextel's suppliers, customers or other constituents), minutes, reports and materials of the Board and its committees, other documents identified as confidential by Sprint Nextel, and the proceedings and deliberations of the Board and its committees.

34.     According to Sprint's Code of Conduct of Business Conduct and Ethics (the "Code"), the Company "lead[s] with integrity by embodying these Sprint imperatives and conducting ourselves in accordance with the highest ethical standards."  In relevant part, the Code states:

**Act with Integrity**

*We are responsible for:*
- Complying both with the letter and the spirit of all applicable laws, rules and regulations.
- Observing    high ethical standards when  conducting  business  on  Sprint's behalf.
- Asking questions when in     doubt about the appropriateness of a situation.
- Reporting known or suspected violations    of  any  applicable  laws,  rules, regulations, policies and procedures.

- Certifying familiarity and     compliance with the Code, its standards,      policies and procedures.

*****

## Compete Like Winners

### Competition Law and Business Conduct

It is in Sprint's best interest to compete on a level playing field. Our differentiated products and services speak for themselves when competition is free and open. The antitrust and fair competition laws of the U.S. and of many other countries where we engage in business were developed to encourage healthy competition among businesses and to protect consumers against anti-competitive activities. While it is beyond the scope of the Code to explain these complex laws in detail, compliance with them is critical as the penalties for violations may be substantial – up to and including imprisonment.

*****

## Books and Records

### Accurate and Reliable Business Records

Sprint and others who deal with us rely on accurate and reliable information to make business decisions. Each employee must prepare and maintain all company re-cords accurately and honestly. No false, artificial or misleading entries should be made in any books, records or accounts of Sprint and no company funds should be used for any purpose other than as described in the documents supporting payment. This includes business and financial records. All books, records and accounts must accurately reflect transactions and events, and conform both to Generally Accepted Accounting Principles (GAAP) and to Sprint's system of internal controls over financial reporting.

*****

## Lead with Integrity

### Tone at the Top

Sprint leaders have a responsibility to understand and uphold the Code to their organizations, and to create a tone at the top that encompasses Sprint's imperative of "Acting with Integrity."

Sprint leaders uphold the Code as individuals and demonstrate a visible commitment by:

- Being a positive role model.
- Explaining the Code to your team and ensure they complete ethics training in a timely manner.
- Upholding compliance to the Code.
- Creating an environment where employees can speak up.

11

*****

**Supervisor Responsibility**

Supervisors should exemplify the highest standards of ethical business conduct by integrating the ethics and compliance program into all aspects of their operations, and by encouraging open and frank discussion of the ethical and legal implications of business decisions. Supervisors should also ensure that everyone in their organization receives proper training, completes annual i-Comply certification and clearly understands the legal and ethical expectations of working for Sprint. This includes any aspect of the Code, policies, training or law with particular applicability to their business operations. It is incumbent upon supervisors to take every opportunity to model behaviors consistent with our values and the Code.

35.     As discussed below, the Individual Defendants failed to meet their responsibilities and obligations as provided in the Audit Committee Charter, the Corporate Governance Guidelines, and the Code of Business Conduct and Ethics.  The Individual Defendants' illegal course of conduct constituted breaches of their fiduciary duties to Sprint, violations of law, and resulted in significant harm to the Company.

V.     **SUBSTANTIVE ALLEGATIONS**

A.     **Background of Defendants' Tax Scheme**

36.     Sprint is the third largest wireless telecommunications company in the United States based on wireless revenue, one of the largest providers of wireline long distance services, and one of the largest carriers of Internet traffic in the nation.

37.     Sprint illegally avoided its New York sales tax obligations on approximately 25% of its receipts for flat-rate calling plans—plans for which customers pay a fixed monthly charge for a set or unlimited amount of calling time.  Unlike Sprint, the Company's primary wireless competitors, including Verizon, AT&T, T-Mobile, and Metro PCS, have followed the law regarding collecting and paying its taxes New York taxes.

38.     The contracts between Sprint and its customers—which are written by the Company and not subject to negotiation—represent that the Company will collect all applicable state and local sales taxes on the customer's behalf and pay the amount collected to the government.  The invoices sent to customers do not indicate that Sprint has calculated sales taxes on less than the full fixed monthly charge for voice services.

39.     Since at least August of 2002, the State of New York and localities within New York require and have required payment of sales taxes on the full amount of fixed monthly charges for wireless voice services sold to customers in New York.  The Company, as the provider of the services, is required to collect the sales taxes from its customers and pay them to the State of New York.

40.     New York Tax Law is clear in regards to its taxation of fixed monthly charges for wireless services.  In 2002, the New York State Department of Taxation & Finance (the "New York Tax Department") issued guidance on this provision in a "Technical Services Bureau Memorandum" (the "2002 TSB-M").  The New York Tax Department explained that for mobile telecommunications "the total charge for a given number of minutes of air time that may be used for voice transmission is subject to sales tax under new section 1105(b)(2)."

41.     The 2002 TSB-M gave a concrete example demonstrating that Section 1105(b)(2) requires the payment of New York sales taxes on the full amount of the fixed monthly charges for wireless voice services, regardless of how, or whether, a customer uses them.  For instance, Example 1 of the 2002 TSB-M states as follows:

> Mr. Smith buys a cellular calling plan from a home service provider which includes up to 2500 minutes for use for a flat-rate charge of $49.95 per month. The contract provides that additional charges will apply for calling minutes that exceed the minutes allowed under the plan. In November 2002, Mr. Smith does not exceed the calling minutes allowed under the plan, and is charged $49.95 for the month. Such charge is subject to sales tax under section 1105(b)(2) of tile Tax

13

Law, regardless of whether the calls made under the plan were intrastate, interstate, or international calls.

42.     Under New York Tax Law, the obligations are different with respect to certain telecommunications services that are not sold for a fixed period charge.  As an illustration, Example 2 of the 2002 TSB-M provided the following situation:

> The facts are the same as in Example 1, except that Mr. Smith exceeds the calling minutes allowed under the plan. The $49.95 flat-rate charge is subject to tax under section 1105(b)(2) of the Tax Law, and the separate charges for intrastate calls included in the excess minutes are subject to sales tax under section 1105(b)(I)(B) of the Tax Law. The separate charges for interstate or international calls included in the excess minutes are not subject to sales tax.

**B.     Sprint's Choice Between a Conservative or Aggressive Tax Plan**

43.     Prior to 2002, the Company began to consider unbundling its flat-rate plans that included wireless voice services.  This responsibility fell to Sprint's business group called the "State and Local Tax Group," which was headed by an Assistant Vice President who reported to Sprint's Vice President of Tax who, in turn, reported directly to the Company's Chief Financial Officer.  In 2005, the State and Local Tax Group included 108 permanent employees and included individuals with access to and knowledge of New York State Tax Law.

44.     There were two basic options the Company considered in implementing component taxation: the so-called "conservative" case and the more "aggressive" case.

45.     The conservative case simply involved unbundling internet services from voice services.  Under the conservative approach, the Company could save approximately $623,000 per month in taxes.  Sprint encouraged its competitors to take this conservative approach and be open and honest with regulators regarding component taxation.  Company executives preached this conservative approach at numerous conferences attended by competitors of Sprint.  During this same time, Sprint conducted—in the words of the New York Complaint, "competitive

surveillance"—and learned that its competitors were utilizing the conservative approach. Sprint, however, rejected the conservative approach because, as one Sprint employee stated: "the project was scrapped because there wasn't enough bang/or the buck."

46.     Beginning in July 2005, Sprint began implementing the more aggressive and risky approach to component taxation. As part of this program, the Company began treating part of its fixed monthly access charges for wireless voice services as if they were charges for interstate calls charged on a per-minute basis and not collecting and paying sales taxes on that part.

47.     However, because the fixed monthly charge is not divisible based on customer usage, the Company was forced to use an arbitrary method of allocating the charge into subparts. Using this aggressive—and illicit—plan, Sprint was able to reduce its taxes by an additional $4.6 million per month.

48.     From its inception, Sprint's decision to unbundle its calling plans was driven by its desire to gain a competitive advantage over its competitors by reducing the amount of sales tax it collected from its customers and, thereby, appearing to be a low-cost carrier while reducing revenues for state and local governments and not reducing its own revenues.

49.     The implementation of this aggressive approach allowed Sprint to avoid collecting and paying more than $100 million in taxes throughout New York from mid-2005 through the present.

C.      **Defendants' Knowledge and Disregard of Tax Violations**

50.     Not surprisingly, there were times when Sprint employees discovered the arbitrary nature of the Company's billing and taxing policies in regards to component taxation.

51.     For example, before Sprint began unbundling its services, members of its State and Local Tax Group and its marketing group considered in the early part of July 2005 whether

to communicate with customers about the fact that Sprint had embarked on an aggressive component taxation program. They jointly opted not to communicate the change to the Company's customers because, as Sprint's Director of External Tax stated: disclosing this information would "drive too many calls" to its customer care division. Similarly, in November 2005, a Sprint employee in its Customer Billing Services department questioned a member of the Company's State and Local Tax Group whether unbundling was "presented to the customer as part of the Subscriber agreement, shown in the invoice and/or available to Customer Care Rep." The response was simply that Sprint had "not educated our customers on how we are de-bundling transactions for their tax relief."

52.     Additionally, in 2009, Sprint had discovered that, for certain plans sold around the country, including New York, it had failed to break out its fixed monthly charges for wireless voice services and treat part as non-taxable. In other words, the Company discovered that it did not adhere completely to its own unbundling program and therefore accidently collected and paid the correct amount of sales taxes on a number of its plans. As a result, Sprint collected and paid approximately $30 million in taxes from its customers that it had not intended to collect or pay.

53.     Once this $30 million "error" occurred, Sprint employees not familiar with the nature of the Company's unbundling suggested that Sprint seek a refund from taxing authorities for this $30 million "overpayment." This idea, obviously, was rejected by higher level Sprint tax employees that understood the importance of concealing their illegal unbundling scheme. Indeed, Sprint's Director of Telecom Tax wrote in an email: "My 2 cents is that, based on what [another Sprint employee] has laid out here, I don't think we should [seek a refund] - i.e., we can't change our books and records after the fact to support a refund." Sprint's Senior Tax Counsel added: "Sprint is already taking some risk with unbundling. Our risks are exponentially

increased if we try to pursue refunds when we didn't jump through the hoops on unbundling."

Taking this advice, the Company did not seek a refund.

54.     Furthermore, the Company was warned twice by the New York taxing authorities that what they were doing was illegal.   Yet in face of these red flags, the Board did nothing. Further, since the disclosure of the illegal conduct, the Board has still taken no action, despite Defendants' knowledge of the New York Complaint and the illegality of the tax scheme.

55.     Consequently, after years of tax fraud, Empire State Ventures, LLC filed a *qui tam* action in the Supreme Court of the State of New York, County of New York on March 31, 2011.  On April 19, 2012, following an extensive investigation of the allegations raised by Empire State Ventures, LLC, the New York Attorney General filed the New York Complaint. The New York Complaint details a seven year ongoing scheme to defraud the State of New York and its localities out of approximately $100 million in tax revenue. To make matters worse, the Company's fraudulent practices can lead to treble damages (i.e., over $300 million), plus annual interest of 14.5%, a penalty of double the amount of fraudulent underpayments or up to 30% of other underpayments, and substantial harm to the Company's goodwill.

56.     On April 19, 2012, Bloomberg summarized the claims against Sprint in an article entitled, "*Sprint Sued for $300 Million by N.Y. Over Alleged Tax Fraud.*"  The article provided in pertinent part as follows:

> Sprint-Nextel Corp. (S) was sued for more than $300 million by the New York attorney general, who said the third-largest U.S. wireless carrier deliberately failed to pay sales taxes for seven years.
>
> Sprint didn't collect and pay some sales taxes on flat-rate access charges for wireless calling plans, costing state and local governments more than $100 million, Attorney General Eric Schneiderman said in a statement today.

"This case represents a new era in tax fraud prosecutions," Schneiderman said at press conference today. ***"The deliberate failure to collect or pay your fair share of taxes will not be tolerated in New York state." [emphasis added]***

The attorney general said he is taking over a whistle- blower lawsuit filed in New York in March 2011 and is seeking three times Sprint's alleged underpayment of more than $100 million plus penalties under the state's false claims act.

John Taylor, a spokesman for Overland Park, Kansas-based Sprint, said in an e-mailed statement that it would fight the lawsuit.

**'Every Penny'**

"We have collected and paid over to New York every penny of sales taxes on mobile wireless services that we believe our customers owe under New York state law," Taylor said. "The attorney general's office is claiming New York consumers, who already pay some of the highest wireless taxes in the country, should pay even more."

Wireless carriers selling a set number of minutes of calling time for a fixed monthly charge must collect and pay sales taxes on the entire charge, Schneiderman said. Sprint treated a portion as nontaxable and withheld about 25 percent of the taxes it was supposed to collect and remit to state and local governments, according to the attorney general.

***The move arose from a nationwide effort by Sprint to gain an advantage over competitors including AT&T Inc. (T) and Verizon Wireless, which correctly collect and pay the taxes, Schneiderman said. [emphasis added]***

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

57.   Plaintiff is a current owner of Sprint common stock and was an owner of Sprint common stock during the entire period relevant to Defendants' wrongful course of conduct alleged herein.

58.   Plaintiff brings this action derivatively to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, abuse of control, waste of corporate assets, and unjust enrichment by Defendants.

59.   Plaintiff has not made any demand upon the Board to bring an action on behalf of Sprint asserting claims herein to recover damages for the injuries suffered by Sprint, since such

demand would have been a futile, wasteful and useless act, and is therefore excused, for the reasons stated herein.

60. Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the Director Defendants and are not subject to the protection of any independent business judgment.

61. Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by the Director Defendants. These Defendants are subject to liability for breaching their fiduciary duties to the Company by, among other things, causing Sprint to enter into improper business practices, as discussed above.

62. The Director Defendants' wrongful conduct was continuous and occurred throughout the applicable time period. It resulted in ongoing and continuous harm to the Company. The Director Defendants participated in and/or failed to adequately address, correct and/or disclose such conduct, despite the fact that each of these Defendants was responsible for ensuring that Sprint complied with all applicable laws and regulations and that the Company maintained adequate accounting, financial and other controls.

63. Demand is excused because the Director Defendants face a substantial likelihood of liability in this action because of their acts alleged herein. By their wrongful acts and omissions, the Director Defendants were unjustly enriched at the expense of and to the detriment of Sprint. These Defendants received compensation and director remuneration at the same time in which they were breaching their fiduciary duties owed to the Company.

64. In addition, demand is also excused because the Director Defendants have ratified the egregious actions outlined herein, and they cannot be expected to prosecute claims against themselves and/or persons or entities with whom they have extensive inter-related business and

professional and personal entanglements if Plaintiff demanded that they do so.   These Defendants, because of these relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of Sprint.

65.   Demand is also excused because the Director Defendants participated in, approved or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly or negligently disregarded them, and are therefore not a disinterested party and lack sufficient independence to exercise business judgment as alleged herein.

66.   Demand is also excused because the Audit Committee Defendants, contrary to the edicts of the Audit Committee charter cited herein, knowingly and recklessly failed to take any action to correct Defendants' illegal tax evasion scheme.   Despite meeting on numerous occasions during the Relevant Period—over the past seven years that the tax scheme has been ongoing, the Audit Committee has met almost 70 times—none of the Audit Committee Defendants took any steps to stop the tax scheme and none of the Audit Committee Defendants acted upon their knowledge of the potential consequences to the Company as a result of the scheme.

67.   Because of their failure to act, and the resultant breach of fiduciary duties, the Audit Committee Defendants face a substantial likelihood of liability for breach of fiduciary duty.   These Defendants failed to oversee Sprint's compliance with regulatory and legal requirements, failed to meet their internal auditing functions that were crucial to maintaining the Company's compliance with regulatory and legal requirements, and they failed in their oversight responsibilities for the Company's management.

68.   In addition to the Audit Committee Defendants, Defendants Bethune, Nilsson, Hill and O'Neal each served on the Nominating and Corporate Governance Committee of the

Board. This Committee is charged with ensuring that Sprint "has effective corporate governance policies and procedures and an effective Board and Board review process." Given the gravity and scope of the Company's violations during the Relevant Period, the members of the Nominating and Corporate Governance Committee failed in these responsibilities and are thus liable for their breaches of fiduciary duty.

69.     The Company has been directly and substantially injured by reason of defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Sprint. Plaintiff, as a shareholder of the Company, seeks damages and other relief on behalf of Sprint, in an amount to be proven at trial.

## VIII.   CONSPIRACY, AIDING AND ABETTING,  AND CONCERTED ACTION

70.     In committing the wrongful acts complained of herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective fiduciary duties.

71.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was embarking on an illegal and illicit scheme in contravention to regulatory and legal requirements; (ii) maintain the Individual Defendants' directorial and/or executive positions at Sprint and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Sprint, regarding the Individual Defendants' management of Sprint's operations, the Company's financial health

and stability, and the Company's business prospects.  In furtherance of this plan, the Individual Defendants collectively and individually took the actions set forth herein.

72.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time, the Individual Defendants caused the Company to conceal its true business actions and prospects.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets and abuse of control.

73.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently engage in an improper and illegal course of conduct.   Because the actions complained of herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct alleged herein.

74.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IX.    CLAIMS AGAINST DEFENDANTS

### COUNT I
### (Breach of Fiduciary Duty)

75.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

76.    Certain of the Individual Defendants, including Defendants, owed a fiduciary duty to Sprint to supervise the Company to ensure that it complied with all applicable laws and regulations.  Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Sprint's internal controls and by allowing the Company to engage in illegal and illicit conduct.

77.    Defendants have engaged, knowingly or recklessly, in a sustained and systematic failure to exercise their oversight responsibilities to ensure that Sprint complied with all applicable laws, rules and regulations.

78.    As members of the Sprint Board, Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violations of applicable legal and regulatory requirements as alleged herein.  Each of them had knowledge of and actively participated in and/or approved of or acquiesced in the wrongdoings alleged herein or abdicated his/her responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing have subjected Sprint to unreasonable risks of loss and expenses.

79.    Each of Defendants' acts in causing or permitting the Company to engage in such illegal and illicit acts and abdicating their oversight responsibilities to the Company has subjected the Company to liability for violations of law, and therefore was not the product of a valid exercise of business judgment and was a complete abdication of their duties as officers and/or directors of the Company.  As a result of Defendants' breaches, Sprint has lost market

capitalization and has had its reputation in the business community and financial markets irreparably tarnished.

80.    By reason of the foregoing, Sprint was damaged.

81.    Plaintiff, on behalf of Sprint, has no adequate remedy at law.

<u>COUNT II</u>
**(Gross Mismanagement)**

82.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

83.    Certain of the Individual Defendants had a duty to Sprint and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of the Company.

84.    The Individual Defendants, by their actions and be engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Sprint in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of Sprint's affairs and in the use and preservation of the Company's assets.

85.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Sprint to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Sprint, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged Sprint.

86.    By reason of the foregoing, Sprint was damaged.

87.    Plaintiff, on behalf of Sprint, has no adequate remedy at law.

24

## COUNT III
### (Contribution and Indemnification)

88.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

89.     Sprint is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to Sprint.

90.     Sprint's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants as alleged above, and Sprint is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are or may in the future be asserted against, Sprint by virtue of the Individual Defendants' misconduct.

91.     By reason of the foregoing, Sprint was damaged.

92.     Plaintiff, on behalf of Sprint, has no adequate remedy at law.

## COUNT IV
### (Waste of Corporate Assets)

93.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

94.     Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Sprint' internal controls and by allowing misleading statements and filings to be issued and disseminated.

95.     As a result of the Individual Defendants' illicit course of conduct and breaches of fiduciary duties, Sprint has wasted valuable corporate assets through payments of compensation

to certain of its executive officers.  In addition, the Company has incurred significant potential liability for legal costs, penalties, fines, and/or legal fees in connection with the defense of the Individual Defendants' unlawful course of conduct complained of herein.

96.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

97.    By reason of the foregoing, Sprint was damaged.

98.    Plaintiff, on behalf of Sprint, has no adequate remedy at law.

### COUNT V
**(Abuse of Control)**

99.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

100.    The Individual Defendants owed duties as controlling persons to Sprint' public shareholders not to use their positions of control within the Company in contrary to the interest of the Company's public shareholders.

101.    The conduct of the Individual Defendants amounted to an abuse of their abilities to control Sprint in violation of their obligations to Sprint and the Company's public shareholders.

102.    As a result of the Individual Defendants' abuse of control, Sprint has sustained and will continue to sustain irreparable injury, for which there is no adequate remedy at law.

**X.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

(a)    Directing the Individual Defendants to account to Sprint for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

26

(b)    Requiring the Individual Defendants to return to Sprint all salaries and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Sprint;

(c)    Directing the Individual Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of the Individual Defendants' culpable conduct;

(d)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

(e)    Granting such other and further relief as the Court may deem just and proper.

103.    **<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury.

DATED: May 30, 2012                              By:    ___/s/___James P. Frickleton_____
                                                              James P. Frickleton, KS # 20602

                                                              SAXENA WHITE, P.A.
                                                              Maya Saxena *(pro hac vice pending)*
                                                              Joseph E. White, III *(pro hac vice pending)*
                                                              Christopher S. Jones *(pro hac vice pending)*
                                                              Lester R. Hooker *(pro hac vice pending)*
                                                              2424 North Federal Highway, Suite 257
                                                              Boca Raton, FL  33431
                                                              Telephone: (561) 394-3399
                                                              Facsimile: (561) 394-3382

                                                              and

                                                              BARTIMUS, FRICKLETON, ROBERTSON &
                                                              GORNY, P.C.
                                                              James P. Frickleton, KS #20602
                                                              11150 Overbrook Road, Suite 200
                                                              Leawood, KS  66211
                                                              Telephone: (913) 266-2300
                                                              Facsimile: (913) 266-2366

                                                              *Counsel for Plaintiff*

## NOTARIZED VERIFICATION

I, Robert Williams, verify on behalf of the NECA-IBEW Pension Trust Fund (hereinafter collectively as "NECA IBEW") that I have reviewed the foregoing Verified Shareholder Derivative Complaint on behalf of nominal defendant Sprint Nextel Corporation, and that the allegations as to the NECA-IBEW and its own actions are true and correct and that the other allegations upon information and belief are true and correct.

Dated: May 24, 2012

_____   (Signature of Robert Williams)

SWORN TO AND SUBSCRIBED before me this 24 day of May, 2012

_____
Notary Public

My Commission Expires: 10|10|15

OFFICIAL SEAL
ROBIN K HAMILTON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/10/15